UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED
JAN - 4 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES OF AMERICA : Criminal No. ~~06-437-M~~
: CR-06-356
v. :
: VIOLATION:
MARCIA CAMPBELL, : 18 U.S.C. § 1343 (Wire Fraud)
: 28 U.S.C. § 2461(c) (Criminal Forfeiture)
Defendant. :

Let this be filed.
Royce C. Lamberth
U.S.D.J. 1/4/07

**STATEMENT OF FACTS**

On February 8, 2000, defendant **MARCIA CAMPBELL** was hired as a staff accountant by The Pharmaceutical Research and Manufacturers of America, otherwise known as PhRMA. Her starting salary was $52,000. She was initially responsible for payroll and reconciliation of the corporate credit card accounts. Within months, defendant **MARCIA CAMPBELL** was given significantly more responsibilities in the accounting department including serving as the accounting system administrator. She was consistently praised for her knowledge and skilled use of PhRMA's computer system.

By November 2001, she was given the title "Finance Manager and Benefits Administrator" and was responsible for bank account reconciliations, journal entries, audit and financial report research, and the supervision of the payroll and accounts payable staff accountants. In June 2003, she was promoted to Accounting Manager. During fiscal year 2004, defendant **MARCIA CAMPBELL** took the initiative to automate several important accounting functions, including electronic fund transfers. In July 2005, defendant **MARCIA CAMPBELL** was once again promoted and given the title Director of Accounting. Throughout her employment with PhRMA her salary steadily increased to $92,200.

During all times alleged in the Information, PhRMA's accounts payable processing began

in one of PhRMA's various departments with the receipt of an invoice from a vendor. Before the invoice was sent to the accounting department, two department officials were required to authorize payment by signing the invoice. The vendor could be paid in three ways: check, wire or electronic fund transfer ("EFT"). If an EFT was the authorized form of payment, the vendor's bank information would be provided to the Accounting Department where it would be entered into PhRMA's financial accounting system by one of defendant **MARCIA CAMPBELL's** staff accountants. Unless the accounting department was subsequently told to change this particular vendor's bank information, all future EFTs would be routed in the same fashion. In other words, all vendors containing EFT banking information within the EFT supplement to the master vendor listing would automatically receive payment via EFTs. The staff accountant when she entered another invoice for payment into the financial accounting system would assume that the bank information as previously entered was accurate.

Once the staff accountant entered the EFT payments into the database, but before the electronic message was transmitted to PhRMA's bank in Richmond, Virginia, several reports were generated for further approval by the Controller. A summary of all EFTs for that particular time period, the individual remittances and the supporting documentation, such as the invoices from the department heads who authorized payment, were given to the Controller. It was PhRMA's practice that the Controller would only scrutinize the back-up documentation for EFT payments greater than $5,000. The Controller would indicate her authorization by signing the first page of the summary report and the individual EFT remittance. Then, the Controller would give the EFT package to one of defendant **MARCIA CAMPBELL's** staff to electronically transmit the EFT information to PhRMA's bank, in Richmond, Virginia.

Unlike EFTs, wire transfers are costly. As such, PhRMA required the additional

authorization of two signatures from the Finance Division's management team. The Controller, the Vice President of Financing and the Chief Financial Officer were the only managers permitted to approve wire transfer payments. The approved wire transfer requests were similarly given to one of defendant **MARCIA CAMPBELL**'s staff who would release the funds by electronically transmitting a request to PhRMA's bank in Richmond, Virginia.

In early 2005, defendant **MARCIA CAMPBELL** began telling friends of her plans to leave PhRMA and return to her native country of Jamaica. During the same time period, defendant **MARCIA CAMPBELL** began devising a scheme to misappropriate funds from PhRMA. In January 2005, defendant **MARCIA CAMPBELL** created three documents on her PhRMA computer: Articles of Incorporation for an entity known as Crossing Travel Borders, an international consulting agreement between PhRMA and Crossing Borders Travel and a Crossing Borders Travel invoice for $14,263.48 in travel services purportedly provided to PhRMA. On June 7, 2005, defendant **MARCIA CAMPBELL** opened a bank account at Wachovia Bank in the name of Crossing Borders Travel in which she was the sole signatory.

On or before June 9, 2005, defendant **MARCIA CAMPBELL** used her systems administrator rights to access PhRMA's master vendor list to create an EFT account for Merrill Lynch, a vendor who had always received payments via check and never requested any other form of payment. Defendant **MARCIA CAMPBELL** entered her Wachovia Bank Crossing Borders account information into Merrill Lynch's vendor profile. Accordingly, when the staff assistant released the batch of EFT payments, PhRMA's bank in Richmond, Virginia transmitted the $3,750.05 payment to Wachovia Bank, in Charlotte, North Carolina.

Shortly thereafter, defendant **MARCIA CAMPBELL** accessed PhRMA's EFT supplement and deleted her Crossing Borders Travel bank account information. On June 23,

2005, she further authorized a check payment to Merrill Lynch in the same amount to cover-up her misappropriation. Defendant **MARCIA CAMPBELL** incorrectly recorded the two payments in the general ledger.

Less than a week later, on June 15, 2005, defendant **MARCIA CAMPBELL** telephoned PhRMA's local bank branch and requested a wire transfer in the amount of $58,593.39 to be made from PhRMA's bank account to her Wachovia Crossing Borders Travel account. Again, on June 28, 2006, defendant **MARCIA CAMPBELL** telephoned PhRMA's local bank branch and requested a wire transfer in the amount of $27,000 to be made from PhRMA's bank account to her Wachovia Crossing Borders Travel account. When the bank statements arrived at PhRMA's office, defendant **MARCIA CAMPBELL** took steps to conceal her misappropriation. She copied the names and wire information of other legitimate vendors from different portions of the bank statement and pasted this information where Crossing Borders Travel had actually appeared. Since PHRMA's monthly bank statements are quite lengthy, it would have been difficult to detect these changes without conducting a thorough reconciliation. Furthermore, no one other than defendant **MARCIA CAMPBELL** regularly conducted the monthly bank statement reconciliations.

Beginning on October 7, 2005 and continuing to September 15, 2006, defendant **MARCIA CAMPBELL** caused six additional EFTs in the amount of $46,290, $50,000 $125,000, $98,600.33, $20,038.84, and $1,197.96, respectively, to be sent from PhRMA's bank account in Richmond, Virginia to her Wachovia Crossing Borders Travel bank account, in Washington, D.C.[1] During the same time period, she also caused two EFT in the amount of

---

[1] On May 19, 2006 and May 25, 2006, defendant **MARCIA CAMPBELL** attempted to cause EFTs in the amounts of $24,487 and $25,000, respectively, to be sent from PhRMA's bank

$150,000 and $73,650 to be transmitted from PhRMA's bank account, in Richmond, Virginia to be sent to her personal Washington Mutual bank account and another in the amount of $15,000 to be transmitted to a Citibank account, which she maintained in her own name. Finally, on September 26, 2006, defendant **MARCIA CAMPBELL** caused another EFT in the amount of $37,223.25 to be transmitted to the Merrill Lynch investment account of an associate who resides in Jamaica.

Unlike the Crossing Borders Travel wires, these EFT payments were intended for legitimate vendors. In order to divert these funds, defendant **MARCIA CAMPBELL** accessed PhRMA's financial accounting system and re-routed payments intended for legitimate PhRMA vendors to her or her associate's bank accounts. Knowing that PhRMA's vendors would inquire when they did not receive payment, defendant **MARCIA CAMPBELL** endeavored to pay them as well.[2] For the most part, these legitimate payments were made as originally instructed by PhRMA's requesting department and approved by PhRMA's Controller. Where two payments were made, defendant **MARCIA CAMPBELL** entered both payments into the general ledger with offsetting debits and credits.

In total, defendant **MARCIA CAMPBELL** misappropriated $706,343.82 from PhRMA for her personal benefit. She moved the embezzled funds between various accounts she

---

account in Richmond, Virginia to her Wachovia Crossing Borders Travel bank account in Charlotte, North Carolina. When she assessed PhRMA's financial accounting system to re-route legitimate vendor payments, she inaccurately entered her own account number by one digit.

[2] It appears that defendant **MARCIA CAMPBELL** had not made all the legitimate vendors whole before PhRMA detected defendant **MARCIA CAMPBELL's** embezzlement scheme in October 2006. Indeed, it was the vendor who should have received the $73,560 on or about July 25, 2006 who notified PhRMA of the accounting problem. When she became aware of PhRMA's knowledge of this missing payment, defendant further endeavored to conceal her crime by altering a PhRMA accounting report to mask that this $73,560 payment had been routed to her Washington Mutual bank account.

controlled and ultimately used a significant portion to facilitate her plan to return to Jamaica. Defendant **MARCIA CAMPBELL** used some of the misappropriated funds to purchase two adjacent residential lots in Jamaica for herself and a close friend by wiring at least $176,650 to legal counsel in Jamaica. Defendant **MARCIA CAMPBELL** also used approximately $17,600 of the embezzled funds to renovate a rental property in Florida and thousands more to throw herself a party in Jamaica during the 2006 Labor Day weekend.

I, Marcia O. Campbell, agree that this is an accurate statement of the offense for which I have agreed to plead guilty.

Date:_____          _____
                              MARCIA O. CAMPBELL