UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 06-356 (RCL) |
| v. | : | |
| MARCIA CAMPBELL, | : | |
| Defendant. | : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States by and through its attorney, the United States Attorney for the District of Columbia, hereby submits the following memorandum in aid of sentencing. Consistent with the plea agreement in this case and the concurrence of the United States Probation Office, the Government requests that this Court sentence defendant to a prison term within the recommended Guideline range of 41 to 51 months and order restitution in the amount of $706,344.78.[1]

I.   **FACTUAL BACKGROUND**

During the plea proceedings, defendant agreed with the Statement of Facts submitted to the Court by the government, which has been incorporated into the Presentence Investigation Report ("PSI"). See PSI at ¶¶ 8-19. In summary, from June 7, 2005 through October 13, 2006, while employed as the Director of Accounting for The Pharmaceutical Research and Manufacturers of America ("PhRMA"), defendant embezzled approximately $706,348.82.

---

[1] Prior to defendant's agreement to plead guilty, the government had seized or restrained funds in various bank or investment accounts controlled by defendant. In addition, two individuals who had received tainted funds from defendant voluntarily returned these funds to the government and/or PhRMA. See Plea Agreement at ¶5. Defendant has agreed to forfeit all interest in these particular funds and consented to the issuance of a money judgement in the amount of $552,652.44, which represents the balance of the amount of proceeds she derived from the wire fraud scheme.

Defendant's scheme was a sophisticated one. She used her computer rights to access PhRMA's accounting database and redirect electronic payments intended for legitimate PhRMA to bank accounts she controlled. She also telephoned PhRMA's bank on two occasions and instructed them to wire transfer funds directly into her bank account. Defendant took numerous steps to cover up her misappropriations, including directing duplicate payments to the legitimate vendors, bypassing PhRMA's internal approval requirements for electronic and wire transfer payments, making false entries in PhRMA's accounting records to balance the general ledger, and physically altering PhRMA's bank statements to delete any reference to the fraudulent transactions.

Most of these stolen funds were transmitted into a bank account in the name of a fictitious entity, Crossing Borders Travel. Defendant opened this account on June 7, 2005 - just two days before the first misappropriation. In an apparent effort to further conceal these fraudulent payments, defendant created several documents relating to Crossing Borders Travel that purportedly created a business relationship between this entity and PhRMA. According to an unsigned international consulting agreement between Crossing Borders Travel and PhRMA that defendant created on her office computer, Crossing Borders Travel was to provide consulting services to PhRMA's personnel in Europe and China. In return, PhRMA was obligated to pay Crossing Borders Travel a fee of $135,000. At approximately the same time she created this agreement, defendant also prepared an invoice addressed to PhRMA, seeking payment for services provided by Crossing Borders Travel to PhRMA in the amount of $14,263. No such business relationship existed nor were any services rendered to PhRMA.

It is clear from the evidence that defendant embezzled these funds in anticipation of her retirement from PhRMA, at which time she intended to return to her native country of Jamaica. On February 14, 2005, defendant wrote a friend an email in which she stated: "I am still working on my project for Jamaica, going slowly." Two months later, on April 12, 2005, she wrote another acquaintance that she was "so looking forward to be in Jamaica by the end of 2006." On July 26, 2005, explained by email that she intended to quit her job at PhRMA after returning from a trip to Turkey so she "can work on [her] JA project full time."

Defendant had no intentions of simply retiring in Jamaica. She was going to use these embezzled funds to open businesses in Jamaica. It appears from her email traffic that defendant toyed with several different business concepts. On March 9, 2005, defendant sent a 30 page strategic business plan for a supermarket grocery and general merchandise store to one of her friends. Under the name Thyme Square. LLC, defendant considered operating in the Trelawny province of Jamaica where she would specialize "in general merchandise and grocery items, including select meat, produce and dairy lines to make fresh products more accessible to residents and tourists in the area." To launch operations, defendant was seeking to raise $300,000 in start-up capital.

Also, in the province of Trelawny, defendant intended to build a luxurious hotel and spa that she would own and manage. On May 5, 2005, defendant sent the same friend, who received the Thyme Square business plan, a copy of her letterhead for the Jamaica Mountain Hotel & Spa. The following month, on June 21, 2005, defendant received an engagement letter from The Business Plan Store in Harleysville, Pennsylvania, proposing to prepare a written business plan for the Jamaica Mountain Hotel & Spa. Less than a week late, on June 26, 2005, defendant

received a 21 page business plan, in which defendant estimated the startup costs for the hotel would be $1,554,000. As the owner, defendant intended to contribute $40,000, which equaled the cost for the land, and was seeking $1,514,000 in debt financing.[2] The very next day, defendant began sending the plan to potential investors.[3] On July 12, 2005, potential investors were invited to view these investment opportunities in Jamaica. Air fare from Newark, New Jersey to Jamaica and hotel accommodations in a resort had been arranged. The total cost of the 5 day trip was $1,100 per person.[4]

In addition to building a business with PhRMA's funds, defendant intended to build a home for herself in Jamaica. In February 2006, defendant traveled to Jamaica with an American friend, who is an architect by trade, on a house hunting exhibition. Defendant found a residential community to her liking with its own beach and guard service that regularly patrols and controls the traffic. On June 9, 2006, defendant wire transferred $102,000 to an attorney in Jamaica to execute the purchase of a lot with a waterfront view. She titled this lot in her and her sister's name. Several months later, she purchased another lot for her architect friend who defendant asked to assist her in designing her home. Again, she used PhRMA funds when she sent $74,650 to another Jamaican attorney to consummate the purchase.

---

[2] Defendant had already purchased a piece of property in the cockpit country, which is in the center of the island in the mountains where she was raised and her parents own land.

[3] On June 15, 2005 and June 28, 2005, defendant fraudulently directed wire transfers to the Crossing Borders Travel bank account in the amount of $58,593.39 and $27,000, respectively. Between October 7, 2005 and March 6, 2006, defendant caused electronic transfers in the amounts of $49,290, $150,000, $50,000, and $125,000 into bank accounts she controlled.

[4] It is unknown whether defendant raised the estimated funds to start the construction projects. After the planned trip, however, defendant continued to steal from PhRMA in far greater amounts.

During the embezzlement scheme, defendant also spent more than $17,000 on improvements to a rental property she owns in Florida. She traveled on several occasions to Florida while these renovation projects were in progress. She also took a trip to Turkey and Denmark with two friends. Shortly before her scheme was uncovered, she paid at least $8,000 to take a group of friends on a long labor day weekend to Jamaica to celebrate her birthday. It remains unknown how she spent the remaining $492,685 of the diverted funds that have not been accounted for.

## II.    SENTENCING RECOMMENDATION

### A.    Sentencing Guidelines

Section 2B1.1 of the Guidelines Manual controls sentencing for wire fraud and the offense level is dependent upon the amount of loss. Defendant and the government have stipulated that the total loss is more than $400,000, resulting in a base offense level of 21. See U.S.S.G.§ 2B1.1(a) & (b) (base offense level 7 increased by 14 due to loss of more than $400,000). The parties also agreed that defendant's conduct involved sophisticated means, thereby increasing her base offense level to 23. See U.S.S.G.§ 2B1.1(b)(9)©. Finally, the parties agreed that defendant abused the position of trust bestowed upon her by PhRMA and a two-level increase to a base offense level of 25 is warranted, pursuant to U.S.S.G. § 3B1.3.

Pursuant to the plea, the government agreed that defendant is entitled to a three-level decrease to the offense level pursuant to Section 3E1.1. With an offense level 22, the defendant's guideline range is 41 to 51 months incarceration. See PSI at ¶ 62.

B.      Sentencing Factors under 18 U.S.C. §3553

As the Court is well-aware, the recommended sentence set forth in the Sentencing Guidelines is but one factor this Court should consider in determining an appropriate sentence. The Court should also consider the factors set forth at 18 U.S.C. § 3553.[5] As set forth below, these additional considerations do not provide a basis in this case for a sentence other than that recommended by the Sentencing Commission and agreed to by defendant.

A sentence within the range of 41 to 51 months is appropriate to the nature and circumstances of the offense and the history and characteristics of the defendant. See §3553(a)(1). Defendant's scheme was carefully planned, intentionally deceptive and carried out over a long period of time. If she had not been caught, it is more than likely that she would have continued stealing until she amassed enough sufficient resources to fund the above mentioned business enterprises and build her new home in Jamaica. In addition, defendant used her special skill as an accountant and her high level position within an international agency to steal more

---

[5] The district court needs to consider the goals of Section 3553 in determining the appropriate sentence, however, the court is not required to specifically refer to each factor listed in § 3553(a). See United States v. Ayers, 428 F.3d 312, 315 (D.C. Cir. 2005). Section 3553(C) provides that the court at the time of sentencing shall state in open court the reasons for its imposition of a particular sentence. Section 3553 specifically sets out the factors to be considered: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective matter; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for the . . . offense . . . as set forth in the guidelines . . . (5) any pertinent policy statement issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

than $700,000. Even when she was confronted by her employers, defendant denied her involvement and attempted to pose alternative explanations for how monies were diverted into her personal bank account.

The loss to her employer was much greater than the amount she embezzled. Indeed, PhRMA was forced to spend more than $300,000 to hire forensic accountants and devote enormous number of hours of their accounting staff's time in efforts to determine the extent of defendant's embezzlement. As PhRMA explained in its victim impact statements, defendant caused psychological harm as well:

> Ms. Campbell stole peoples' trust in human beings and colleagues. She created unnecessary fear and insecurity among PhRMA staff; she damaged PhRMA's relationships with numerous vendors; and she created embarrassment as we faced our members who pay our dues. To this degree, the recovery goes beyond money; it involves rebuilding relationships and trust, educating our staff throughout PhRMA and rebuilding our systems and processes from the ground up . . .

Defendant's history and characteristics reflect a well educated individual with employable skills and a salary more than sufficient to support herself. She had a traditional upbringing in Jamaica and was fortunate to attend college in the United States where she earned several degrees. She has a loving family who remain loyal and supportive. Although her elderly parents have suffered medical conditions requiring treatment, there is no evidence other than defendant's declaration to the Presentence Report writer that she used some of these embezzled funds to care for her parents. Moreover, their medical conditions and defendant's obligation to care for her elderly parents in no way justified defendant deliberately stealing these monies.

Furthermore, only a sentence of lengthy period of imprisonment is sufficient to reflect the seriousness of the offense, promote respect for the law, and provide just punishment, and at the same time, "afford adequate deterrence to [future] criminal conduct." See §3553(a)(2)(A) & (B). Deterrence and respect for the law are both lacking where the sole punishment for stealing -– only if and when it is detected –- is disgorgement of the money. A message needs to be sent to defendant and others that such conduct will not be tolerated and those who choose to commit like crimes would be sentenced harshly.

Significantly, Section 3553 places fundamental emphasis on uniformity of sentencing, which adherence to the guidelines provides.[6] As the Court is aware, the offense level for cases involving similar embezzlement conduct is driven by the amount of loss caused by a defendant's criminal activity. In this case, defendant stole or attempted to steal nearly twice as much as the loss amount sufficient to trigger the base offense applicable here.[7] Undoubtedly, others who stole considerably less than this defendant have been sentenced to terms of imprisonment

---

[6] It is clear from the explicit language of the statute that the framers both endorse and respect the ranges set by and the policy statements made by the United States Sentencing Commission, which in these circumstances recommends imprisonment. The converse is also true: the Sentencing Guidelines explicitly recognizes §3553 as its linchpin, setting forth in its preamble its reliance on the statute and calling out each and every factor set forth therein. We note most particularly the factor set forth in §3553(a)(6), "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," which is the heart and spirit of the Guidelines. See 18 U.S.C. §3553(a)(6). It is in with this commitment that the government presses the Court for a sentence consistent with the Sentencing Guidelines.

[7] In May 2006, defendant attempted to transfer an additional $49,487 to her personal bank account. Defendant, however, entered an incorrect account number and the transfers were not completed.

equivalent to that which the government seeks here.  Defendant can articulate <u>no</u> compelling fact or circumstance that justifies a sentence lower than similarly situated offenders.

### III.  **CONCLUSION**

For the reasons set forth herein, the government believes that a sentence within the applicable guideline range of 41 to 51 months and an order of restitution is necessary, reasonable and appropriate in this case.

                              Respectfully Submitted,

                              JEFFREY A. TAYLOR
                              UNITED STATES ATTORNEY
                              D.C. Bar Number 498610

                              SUSAN B. MENZER
                              Assistant United States Attorney
                              D.C. Bar Number 421007
                              United States Attorneys Office
                              Fraud and Public Corruption Section
                              555 4th Street, N.W.
                              Washington, D.C.  20530
                              (202) 514-6968