UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 06-356 |
| | ) | Judge Lamberth |
| MARCIA CAMPBELL, | ) | Sentencing Date:  May 4, 2007 |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Defendant Marcia Campbell is a 46-year old woman in poor health with no previous criminal record.  Since the age of eighteen, Ms. Campbell has supported herself, and through hard work and perseverance, she built a life and career for herself while earning an Associate's Degree, Bachelor's Degree, and Master's Degree.  She stands before this Court today fully aware that she has thrown away nearly all the hard-earned benefits and achievements of her past 20 years.  For the reasons that follow, we respectfully request that this Court fashion a sentence for Ms. Campbell that would allow her the chance to pay restitution, care for her family, and slowly earn back the trust that she has lost.

### Factual Background

On January 4, 2007, Marcia Campbell pled guilty to one count of wire fraud, arising from monies that she stole from her employer PhRMA for her personal use.  As set forth in the Statement of Facts submitted to the Court at the time of Ms. Campbell's plea, Ms. Campbell was responsible for having diverted $706,348.82 of her employer's monies to her personal accounts during the time period of June 2005 through September 2006.  Of that amount, Ms. Campbell has already forfeited some $153,696.00 and has

1

taken steps to sell her personal property in order to pay back what she has taken. Ms. Campbell has made good faith efforts, including seeking and receiving permission from this Court to travel, in order to sell property in D.C. and Florida to help satisfy her restitution responsibilities. Although a closing on her condominium in Washington, DC had been scheduled for several weeks ago, the buyer's financing fell through and Ms. Campbell has thus been unable to sell that property. Through counsel, Ms. Campbell has indicated to the United States that she is willing to transfer title of her District of Columbia and Florida properties directly to the United States, given the anticipated difficulty she will have selling her property once she is sentenced. Ms. Campbell has fully complied with all the conditions of her High-Intensity Supervision program for the past six months and has always tested negative for any substance abuse.

<u>Defendant's Personal Characteristics</u>

Marcia Campbell left her homeland of Jamaica when she was 18 years old to pursue her educational and career goals. She moved to Fort Lauderdale, Florida, where she attended Broward Community College. Upon completion of her Associate of Arts degree, she attended Florida Atlantic University, where she received a Bachelor of Arts degree in Political Science. Ms. Campbell then moved to Washington, DC. There, she earned a Masters degree in Management from the University of Maryland.

Before working at PhRMA, Ms. Campbell held two professional positions. She served as a bookkeeper at H Vide Marine for nine years while she resided in Florida and, after moving to Washington, DC, she worked in accounting at the Congressional Quarterly. Indeed, Ms. Campbell served these employers with the utmost integrity.

In 2000, Ms. Campbell joined PhRMA.  For the six years that followed, Marcia Campbell held numerous positions within the organization and was a valued member of the company.  Initially hired as a staff accountant in 2000, PhRMA consistently praised Ms. Campbell for her knowledge and skilled used of the computer system.  As a result, she was quickly promoted to Finance Manager and Benefits Administrator in 2001, then to Accounting Manager in 2003.  As the Accounting Manager, she took the initiative to automate several important accounting functions, including electronic fund transfers ("EFTs").  In July 2005, Ms. Campbell continued her impressive ascent up the corporate ladder when PhRMA promoted her to Director of Accounting.

In June 2005, as a part of her responsibilities as Director of Accounting, Ms. Campbell attempted to send a legitimate EFT to Merrill Lynch.  After it was sent, however, Merrill Lynch informed her that it could not accept an EFT—payment had to be made via check.  Unfortunately, no one at PhRMA knew how to cancel the EFT already in progress.  To solve the problem, Ms. Campbell's bank information was entered into the system, thinking that the payment would ultimately be rejected by the system.  But the payment went through to Ms. Campbell's account.  This accident caused Ms. Campbell to become all too aware of how her employer's accounting system could be manipulated for personal gain.  Tragically, she gave in to this temptation.

All was not well in Ms. Campbell's life around this time.  As the only successful professional of her five siblings, Ms. Campbell bore the full burden of caring for her elderly parents (her father is 85 and her mother is 81), both of whom lived in Jamaica.  Ms. Campbell has provided verification that her father suffers from congestive cardiac failure, arthritis, hypertension and prostrate problems while her mother also suffers from

hypertension, diabetes and needs a hip replacement. In 2003, Ms. Campbell underwent a

hysterectomy and in 2004 she had tumors removed from her breasts. Ms. Campbell used

monies diverted from her employer to care for her parents. She is deeply ashamed of this

and has not yet even told her parents about the fact that she has been convicted of a

crime.

## Acceptance of Responsibility

Ms. Campbell is both ashamed and remorseful for the pain and embarrassment

she has brought to her former employer, friends, and family. She has taken affirmative

steps to make amends for her conduct. In addition to the forfeiture of her funds, Ms.

Campbell agreed to a Consent Order of Forfeiture for the amount of monies still owed.

She sought two travel orders from this Court in order to arrange for the sale personal

property so as to make restitution.[1] In the event that Ms. Campbell cannot sell her

Washington, DC and Florida properties prior to sentencing, she has agreed to sign over

the properties to the government.

Ms. Campbell also met with PhRMA in an effort to assist them with explaining

how she was able to manipulate PhRMA's accounting system and so that improvements

could be made to ensure that this type of fraud would not be repeated. During a three and

one-half hour meeting with PhRMA representatives, Ms. Campbell explained the ways in

which she diverted funds from PhRMA and pointed out the weaknesses in its accounting

_____

[1] Only one of the travel orders was authorized in time for Ms. Campbell to utilize it.

system that enabled her to perpetuate her fraud.[2]  Recently, Ms. Campbell composed a

letter to PhRMA officials outlining PhRMA's current procedures for paying vendors, the

methods used by Ms. Campbell to divert funds, and ways to improve the current

accounting procedures.[3]

Factors to be Considered in Fashioning a Just Sentence

Ms. Campbell is precluded by the terms of her plea agreement from seeking a

downward departure from the recommended Sentencing Guidelines range (41 to 51

months).  Although Ms. Campbell cannot request a downward departure, the Court

naturally has discretion to impose a sentence below the Guidelines range and may take

into account many of the same factors in fashioning a just sentence.  Ms. Campbell

---

[2] Counsel has reviewed PhRMA's statement to this Court and is puzzled by PhRMA's representations that Ms. Campbell was "uncooperative." Ms. Campbell met with PhRMA and was questioned by a team of KPMG investigators for over three hours.  Although it was counsel's observation that the questioning was awkward and ineffectual, Ms. Campbell did her best to answer their questions.   During those hours, Ms. Campbell explained how she diverted monies and not once denied her culpability.  The United States has informed counsel that because of PhRMA's opinion that Ms. Campbell was uncooperative, the United States will not abide by its original agreement to ask for a sentence at the low-end of the Sentencing Guidelines.  No representative of the United States was present at the meeting with PhRMA.  Moreover, PhRMA did not request any further meetings with Ms. Campbell.  Lastly, Ms. Campbell's remorse could not be any clearer through her statements at the time of her plea, her conduct during the meeting with PhRMA, and her demeanor as observed by this Court.  The meeting with PhRMA was difficult and frightening for Ms. Campbell given that she was being confronted by a group of people including not only auditors and the general counsel, but former co-workers as well.

[3] Ms. Campbell is aware of the government's allegations regarding her allegedly having flown a group of investors to Jamaica and/or a birthday party for herself; that she was making plans to open a resort or hotel; and, that she paid for a trip to Turkey.  She disputes these allegations.  Specifically, she denies having flown a group of investors to Jamaica, denies having thrown a lavish birthday party for herself, and represents to the Court that her trip to Turkey was paid for by a friend's frequent flyer miles.

5

respectfully asks this Court to consider the following factors—in addition to her
acceptance of responsibility and cooperation.

First, the Court should consider Ms. Campbell's significant health problems in
determining the most appropriate penalty.  The Guidelines indicate that "an extraordinary
physical impairment may be a reason to depart downward, *e.g.*, in the case of a seriously
infirm defendant, home detention may be as efficient as, and less costly than,
imprisonment."  *U.S.S.G. § 5H1.4*.  In this case, Ms. Campbell had a hysterectomy and a
tumor removed from both breasts in 2003 and 2004, respectively.  Currently, Ms.
Campbell has been suffering from fainting, headaches, hair loss and the emergence of
sores on her scalp.  In September 2006, Ms. Campbell fainted in the shower.  She
sustained a cut above her eye that required stitches, a cheek bone fracture, and lost nine
teeth.  A number of tests and treatments have been performed, but none have yielded a
diagnosis as of yet.

On April 11, 2007, counsel conferred with Ms. Campbell's physician – Dr. Silver.
Dr. Silver opined that Ms. Campbell's symptoms raised the specter of possible
circulatory malfunctions that might require either surgery or continuing medication, such
as statins.  Ms. Campbell's current absence of health insurance makes further diagnosis at
this time difficult because the numerous tests that could aid in diagnosis cost too much
for her to afford.

Second, Ms. Campbell also has significant family obligations.  Ms. Campbell
provides all the financial support for her parents, neither of whom have any income.  Her
father has a congestive cardiac failure, arthritis, hypertension, and prostate problems.
Similarly, her mother has uncontrolled hypertension, diabetic mellitus, and needs a hip

replacement. Although Ms. Campbell has five siblings, they are unable to financially support her parents.

Sentencing Ms. Campbell to an extensive period of incarceration effectively would preclude her having any further involvement in her parents' care. This would cause a "substantial, direct, and specific loss of essential caretaking" to Ms. Campbell's family, and the loss of this support "substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant. *See Application Notes 1(B)(i) and (ii) to U.S.S.G. 5H1.6.*

Lastly, Ms. Campbell is already paying a price for her crime. She has lost the hard-won fruits of a lifetime of steady achievement. She is without any means of support and soon will be without any place to live. She will have to live every day of the rest of her life with the knowledge that everything she worked for—her reputation, the respect of her peers, and her family's financial security—is now gone due to her poor judgment and greed.

Prior to the events of this crime, Marcia Campbell showed herself to be capable of contributing great value to her professional and personal community. She respectfully asks this Court to fashion a sentence that would allow her to pay back what she has taken while still allowing her a chance to care for her parents and to slowly prove again to society that she still possesses the integrity and work ethic to be a valuable member of society.

Respectfully Submitted,


___/s/_____
Shanlon Wu, Esq. (DC Bar #422910)
WHEAT WU, PLLC
1050 17th Street NW, Suite 600
Washington, DC 20036
202-496-4963 (phone)
202-466-3226 (facsimile)

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Defendant's Memorandum in Aid of

Sentencing was sent via facsimile and first-class mail, postage prepaid, this 3rd day of

May 2007 to:

Susan Menzer, Esq.
Assistant United States Attorney
555 4th Street, NW
Washington, DC 20001
202-305-8537 (fax)


___/s/_____
Shanlon Wu, Esq.
*Counsel for Defendant*

Dear Hon. Judge Lanberth,

My name is Dyandria Scott, and I am writing this letter to you about my dearest aunt, auntie Marcia. I live in New York with my parents, brother and sister. My baby sister, my brother and myself adores my aunt very much. She is such a wonderful person who is always making sure and encouraging me to do well in school. She is always checking up with my mother about my schoolwork. Judge, I love my aunt and I am begging you to please don't send her away from us, because I don't know how I would take it. I know she is having some problems and I am asking you if you could have some mercy on her at this time. I am praying very hard for her and hope she will be alright. Sometimes I cannot concentrate in school, I just keep thinking and praying that my aunt will be alright. Please, I am asking you again because this would mean so much to our family. She is always ready to anything I have to talk to her about and help me to make the right ot choice.

Thanks you Judge Lamberth.

Ana Janckson-Curtis, ESQ

April 1, 2007

Dear Judge Lambeth:

I have known Marcia Campbell since October of 1999, when she first moved to Washington D.C. Before she moved here I received a call from my brother, George telling me that Marcia was a good friend and that I should look out for her and make her welcome. Indeed she has shown herself to be the very person he recommended: a willing listener, a sympathetic friend, and a wise advisor.

When Marcia first told me that she was charged with embezzlement or wire fraud I was incredulous. I have searched my mind to understand what could have happened to her to have done something like this. According to the dates she is accused to have made deposits into an account I noticed that the events coincided with the hurricane seasons that devastated her parent's home in Jamaica. She is the sibling with primary financial responsibility for caring for her aging parents, and often had to take trips back home when, first her father became ill, and then, her mother, and later when they suffered major damage to their home during the hurricane season. I have also noticed when her fellow workers had events such as birth, death or weddings she was always the first to help out, yet when she was faced with significant family problems; no one was there to help her out. Perhaps because she has always appears so strong and indomitable preferring not to show her vulnerable side.

Marcia was also hurt by the way her employer continued to pile on the work of others more highly paid staff, on her when these employees left, yet kept her compensation well below what the other had received. They gave her the title of "Director." but not the pay. She complained that she was often left out of crucial meeting where she should have been included given her title and work responsibilities. She questioned why two of her supervisors refused to sign certain reports and asked her to do it when the responsibility for this previously lay with them, and felt that perhaps this was to make sure she would be shouldered with the blame for any problems. She did not trust that her employer's were concerned with her career or professional aspirations or her personal well being. I recalled Marcia cutting her Christmas vacation short that she was spending with her family in Jamaica short, so she could return to make sure that the company's payroll was done, while everyone else was on holiday break. She was certainly not being recognized or appreciated for her professionalism and good work. I thought perhaps this may created some anger and resentment in her; I know it generated feelings of mistrust and disappointment. I encouraged her to file an EEO complaint to seek redress, but she, like me, did not really hold out much hope given the flaws in the EEO complaint process. I mention these things because they are the single reason I can see that would have led an individual like Marcia, who is a person of firm religious beliefs and consistently high moral standards to take actions outside her character.

I still consider her trustworthy and would not hesitate to recommend her as trustworthy and loyal. I would feel compelled to explain these criminal charges that she will be convicted of as an aberration from her true character, taken perhaps out of desperation and despair.

Judge, our society will gain nothing by imprisoning Marcia. If imprisonment is simply meant to punish then she has been punished a lot. She has effectively lost the career that took her years to build, she has lost all her assets, and most devastating, she is unable to continue to care for her aging parents. Her health has been affected to the point that she has had to seek medical care for depression and other stress related ailments. The embarrassment and adverse impact on her life are also punishments what will continue for years to come. She is approaching middle age and has to rebuild her life with nothing. She has lost everything, even those things that she valued most that could help her to start over – her profession, her reputation, and her life savings. There is little left for her now but to try to remake her life.  Given everything she is faced with, her main concern is to make right her mistakes by making her employer whole.  Marcia made a mistake at a time when faced with innumerable pressures and moments of weakness. Please allow Marcia Campbell to begin the process of reconstructing her life and contributing to society as soon as possible. Thank you for considering this letter,

*Ana G. Cruds.*

February 6, 2007

To Whom it May Concern:

I met Marcia Campbell approximately 4 years ago while I was moving into the Wardman Court Condominium.  We bonded instantly.   She was so helpful and offered her time and energy to me, a complete stranger at the time. We have a lot in common including the fact that we are both from Jamaica and still have close ties to our island home and we are neighbors, living on the same floor within our condominium development.

Over the past 4 years, Marcia has impressed me with her dedication to any endeavor with which she has been involved.  She was an active member of our Condominium Association where she served as Treasurer for two years. She was also involved with the Jamaican Women of Washington Organization, an organization that among other things raises funds to help the underserved.

It has been my experience that Marcia is a woman of integrity, who is extremely dedicated to her family and friends and is very giving of her spare time.

Furthermore, Marcia's friendship has proven to be invaluable.  She helped me plan my wedding and took exceptional care of me while I was on bed rest for 6 months during my pregnancy.  She has been a major part of my life and my family's life.  My parents, sisters, and friends have all welcomed her with open arms.

Yours faithfully,

Michelle Dillon

February 27 2007

To whom it concerns

I would like to take the opportunity to ask for your consideration when making your decision regarding Marcia Campbell's future.

I have known Marcia for more than 20 years. During that time I have seem where Marcia has always maintained a full time job while pursuing her education. She continued on that path until she gained her masters degree in Political and Computer Science. I have know Marcia to be a very ambitious young lady who tries to excel by demonstrating integrity and high moral standards in whatever she  tries to accomplish in life, whether it involves work or  relaxation.

With this in mind again I do ask for you help in allowing her to continue to accomplish her goals in life to be the citizen of great character that she had started out to do and which in my heart and mind I know that is all and is still her intentions.


Sincerely

*Paulette Q Wms- O'Mealy*

February 2007

Dear Judge Lamberth:

My name is Meshell Scott and I am the sister of Marcia Campbell who is unfortunately a defendant in your courtroom. We are from a very poor but traditional family who was taught the values on honesty, integrity and knowing and doing the difference between right and wrong.

My sister has made a serious error in judgment, and I cannot for the life of me reconcile this most unfortunate event with the person that I know. I know my sister to be honest, hardworking, and compassionate. She is always the person you can call on for a helping hand. Marcia is the person that will not accept the incorrect change in a transaction, she is the person who cannot pass a homeless person on the street without feeling compel to help, and she is the person who has encouraged me among others to further my education and make something of myself.

Marcia is the sole provider for our elderly parents who are both in their eighties and have been suffering from a long list of health issues. Between 2004 and 2006, my father has been hospitalized over twenty times and my mother at least six times. This has taken an emotional and financial toll on us and especially my sister.

My family resides in the Caribbean and the last few hurricane seasons have totally been devastating for them. In just one year, 2005, they were seriously affected by at least eighteen storms. Our older sister has lost her entire home, and my parents lost the roof of the house they live in causing damage to most of their belongings.

Although I have a job and should be helping more, it has been extremely difficult for me. In 2003 my husband had a terrible accident which left him in a coma for 10 months. He has recently only returned to work, and during this period his father has been seriously ill, his mother who had only minor health problems passed away, and I began suffering from hypertension. During all this, my sister has been our source of comfort and help especially with the kids.

In addition, to my parents, my husband parents and my own medical dilemma, my sister has had her own health issues to deal with. Since 2003, she has had three major operations and has been dealing with other health problems that the doctors have not been able to diagnose. Most important, she is the guardian for my new nephews, ages 10 and 13, whose mother passed away from breast cancer four years ago.

Judge Lambeth, the purpose of this letter is simply to ask for leniency for my sister. There is no excuse for my sister's conduct; however, she is a good and decent person who deserves a second chance. I believe the past few months have been very difficult and she has been able to reflect on her conduct. I am begging you to spare her from going to jail, she will be of better value to society as a whole and she is a really decent person in the final analysis.

Yours Respectfully,

Meshell Scott

# Wheat Wu, P.L.L.C.
1050 17th Street, N.W.
Suite 600
Washington, D.C. 20036
202-496-4963 (phone)
202/466-3226/202-587-2980 (facsimile)

<table>
<tr><td><em>Judith Wheat</em><br><em>Admitted in D.C. and Virginia</em></td><td><em>Shanlon Wu</em><br><em>Admitted in D.C. and Connecticut</em></td><td><em>Douglas Whipple, Of Counsel</em><br><em>Admitted in D.C., Virginia and New York</em></td></tr>
</table>

April 26, 2007

Marjorie E. Powell
Senior Assistant General Counsel
PhRMA
950 F Street NW
Suite 300
Washington, DC 20004

Dear Ms. Powell:

This letter is intended to summarize the information provided to PhRMA and KMPG representatives at the February 26, 2007 meeting with Marcia Campbell.  It outlines PhRMA's current procedures for paying vendors, summarizes the methods that Ms. Campbell used to divert funds from PhRMA, and suggests improvements to PhRMA's current accounting procedures.  Given the evident confusion of the KPMG auditors at the meeting, we thought it useful to provide you with the following summary of what information Ms. Campbell provided voluntarily at the meeting.  In essence, the accounting system allowed Ms. Campbell to change the routing numbers associated with particular vendors so that she could route the monies to her own account.

## A.    PhRMA's Current Procedures for Paying Vendors

PhRMA has instituted a four-step process for paying vendors.  First, the Accounts Payable Specialist, Teresa Dorsey, generated transactions for the vendors.  Second, Ms.

Dorsey made a check register, which listed all vendors who were to be paid in the week and was reviewed by the Manager, Tracie Marchant. Third, a Staff Accountant, such as Bola Cole or Sylvia LaFontante, transmitted a report to the bank. This report listed vendors, account numbers, and monetary amounts and was also reviewed by Marchant. Lastly, at the end of the month, Marchant reviewed a report generated by Michael Edwards. Marcia Campbell's role in this review process was to ensure that invoices were coded with the proper accounting code.

**B.    Method Used to Divert Funds**

Ms. Campbell randomly chose transactions when she redirected money from its intended vendors to other accounts. In order to redirect these funds, she needed to change only the account number associated with the intended vendor in the computer for that transaction. Because she just changed the account number and not the vendor name, the check register still bore the proper vendor name. The bank statements presented electronic fund transfers (EFTs) in summary form showing the week's sum total of EFTs without the vendors' names or account numbers. In the case of a wire transfer to Ms. Campbell's Crossing Borders account, the bank statement listed the vendor's name as Crossing Borders; Ms. Campbell cut and pasted the intended vendor's name onto the bank statement in order for the redirection to proceed unnoticed.

With EFTs, the transmittal report was the only step in the process where a redirection of funds was evident. This report would say the correct vendor name accompanied by the altered account number. The accounting system did not reject the changed account numbers, and no part of the system showed that the intended recipient of the funds was unpaid in the transaction. With the current accounting procedures in

place, the only way to detect a redirection of funds would be to ensure tediously that each account number on the transmittal report corresponded with the standard account number used for that vendor.

**C.      Suggestions for Improvement**

Campbell proposed a few improvements that would strengthen PhRMA's accounting system. The system could be changed so that a transaction would not be processed—or would at least be flagged—if an account number does not correspond with the regular account number used for a particular vendor. Alternatively, the computer process could prohibit changing the account number for an individual transaction. With regard to wire transfers, referencing the online bank statements rather than hard copies would prevent tampering with these documents.

I trust that this information will be useful for you in evaluating the strengths and weakness of your accounting systems. Please do not hesitate to contact us with any questions or concerns.

Best Regards,

Shanlon Wu

Cc:     Judge Royce C. Lamberth
        Susan Menzer, Esq.